UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

SUNLAND, INC.,                                        Case No. 7-13-13301 TR

    Debtor.

## MEMORANDUM OPINION

The Chapter 7 trustee put together auction procedures to facilitate the sale of Sunland's peanut butter manufacturing plant in Portales, New Mexico. Two bidders emerged, and an auction was held March 20, 2014. A hearing to approve the sale to the high bidder, Hampton Farms, LLC ("Hampton"), was held March 21, 2014. Right before the hearing, the trustee received a call from Golden Boy Foods, Ltd. ("Golden Boy") offering to pay an extra $5 Million for the assets. The Court therefore must consider what to do with the sale given the unexpected, last-second upset bid.

### I.    FINDINGS OF FACT

The Court finds the following facts:

The Court has jurisdiction over this matter under 11 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

On October 9, 2013, Sunland, Inc. filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Clarke C. Coll was appointed and is duly qualified and acting Chapter 7 trustee in this case ("Trustee"). During the months following the bankruptcy filing, the Trustee met with a number of potential buyers in an effort to sell most of the tangible assets of the estate (the "Acquired Assets").

On January 31, 2014, the Trustee filed a Motion For Orders (A) Authorizing Sale of Assets Free and Clear of All Liens, Claims and Interests, Subject to Higher and Better Offers, (B) Establishing Bidding Procedures, (C) Approving Break-Up Fee, and (D) Approving Surcharge For Trustee's Fees, Commission, And Costs (the "Motion"). By his Motion, the Trustee sought to establish a procedure under which he would sell the Acquired Assets to Ready Roast Nut Company, LLC ("Ready Roast") or any successful bidder at an auction of the assets. Under the proposed procedures, if the Trustee received one or more "Qualified Bids" from parties other than Ready Roast, then the Trustee would conduct an auction of the Acquired Assets and sell them to the high bidder, subject to Court approval. The Trustee sent notice of the Motion, including information regarding the auction, to all parties who expressed an interest in purchasing the Acquired Assets. He also advertised the sale in several national newspapers and trade journals.

On March 5, 2014, Hampton submitted a Qualified Bid to purchase the Acquired Assets. Hampton was the only party to submit such a bid. Shortly thereafter, the Court entered a stipulated order authorizing the sale of the Acquired Assets and adopting the Bidding Procedures attached to the Motion (the "Sale Order"). The Bidding Procedures set forth the requirements for bidding on the Acquired Assets at auction. The Sale Order and Bidding Procedures make clear that any sale is subject to Court approval, and that such approval must include a finding that the successful bid provides the highest or otherwise best value for the Acquired Assets and is in the best interest of the estate.

An auction of the Acquired Assets was conducted on March 20, 2014. Ready Roast and Hampton participated in the auction. A total of 14 bids were made by Ready Roast and Hampton, beginning at $17,475,000. Hampton was the high bidder, with a bid of $20,050,000.

Ready Roast was the back-up bidder, with a bid of $20,000,000. After the auction, Hampton and Ready Roast each executed amendments to their respective asset purchase agreements to amend the purchase price consistent with the auction.

The Court held a hearing on March 21, 2014 to determine whether to approve the sale of the Acquired Assets to Hampton for $20,050,000. Shortly before the hearing the Trustee received a telephone call from Paul Henderson of Golden Boy, offering to buy the Acquired Assets on the same terms and conditions as Hampton, for $25,000,000. After hearing arguments of counsel and the representations of the Trustee, the Court continued the hearing until March 24, 2014.

At the continued hearing, Mr. Henderson testified regarding the events leading up to the last-second upset bid. Golden Boy became interested in purchasing the Acquired Assets shortly after learning of Sunland's bankruptcy filing. At the time, Golden Boy was owned by Tricore Pacific Capital, Inc. In early November 2013, Mr. Henderson visited Sunland's plant to conduct due diligence in connection with the sale of the Acquired Assets. He recommended to Tricore that Golden Boy seeks to purchase the Acquired Assets. Tricore, however, did not want to pursue the acquisition because it was in the process of selling Golden Boy to Post Holdings, Inc. ("Post"). Upon learning that Tricore did not want Golden Boy to proceed, Mr. Henderson asked the Trustee if he would be willing to postpone the sale process for a short period of time. Because of substantial time and economic pressures, the Trustee declined to do so. Shortly thereafter, Mr. Henderson notified the Trustee that Golden Boy was unable to pursue the potential acquisition, but urged him to stay in touch regarding the progress of the sale.

Post completed its acquisition of Golden Boy on or about February 1, 2014. Four days later, the Trustee e-mailed a notice concerning the auction sale of the Acquired Assets to Richard

Harris, the President and CEO of Post Private Brands Group.[1]  The notice stated that the deadline to bid on the Acquired Assets was March 5, 2014.

When Mr. Harris received the February 5, 2014 e-mail, things were rather chaotic at Golden Boy.  He was very busy acquainting himself with his new responsibilities and co-workers at Post.  Mr. Harris forwarded the notice to Mr. Henderson, although it is unclear whether this occurred within a few days of receipt or at a later date.  Regardless, it is safe to conclude that Golden Boy had notice of the auction sale, but also that the notice was not given sufficient attention because the Post acquisition had just closed.

Around this time Mr. Henderson read a story on the internet that led him to believe (wrongly) that Ready Roast had purchased the Acquired Asserts.  He continued to believe that until March 18 2014, when another Golden Boy employee sent him an article about the scheduled March 20, 2014 auction.

Mr. Henderson and Mr. Harris immediately set out to obtain corporate authority to bid on the Acquired Assets.  Mr. Henderson thought there was very little chance Golden Boy would be able to obtain the necessary authority from Post, but it turned out that Mr. Harris was able to do so.

Once corporate authority was obtained, Mr. Henderson tried to contact the Trustee.  He called the Trustee on the morning of March 21, 2014 and left a voicemail message on the Trustee's office telephone in Roswell, New Mexico.  The Trustee was in Albuquerque at the time, preparing for the hearing to approve the sale to Hampton.

Golden Boy did not actually speak to the Trustee until about 1:30 p.m. on March 21, 2014, at which time it conveyed its upset bid offer.  The following Monday, Golden Boy wire-transferred $25 million to Graham Title Company in Portales, New Mexico.  Golden Boy also

---

[1] Prior to the acquisition by Post, Mr. Harris was the President and CEO of Golden Boy.

Case 13-13301-t7    Doc 401    Filed 03/25/14    Entered 03/25/14 11:22:51 Page 4 of 12

executed an asset purchase agreement, which is nearly identical to the agreements executed by Ready Roast and Hampton. If Golden Boy is allowed to buy the Acquired Assets, it is prepared to close on March 28, 2014. Golden Boy intends to process and manufacture peanuts and peanut butter at the plant.

Ready Roast, Hampton, Golden Boy, and the Trustee participated in all aspects of the sale process in the utmost good faith. Golden Boy's failure to submit a timely qualified bid and participate in the March 20, 2014 auction was the result of Mr. Henderson's mistaken belief that the assets had already been sold. Golden Boy did not act with any improper motive in submitting the upset bid when it did, or in failing to participate in the auction.

CoBank, PCA, and Costco also participated in all aspects of the sale process in the utmost good faith. There was no collusion or other improper behavior on the part of the Trustee, Ready Roast, Hampton, Golden Boy, CoBank, PCA, Costco, or any other party in interest. The March 20, 2014 auction was conducted in a regular manner in accordance with the Sale Order and Bidding Procedures.

An additional $5,000,000 would mean a lot to the bankruptcy estate. The evidence on facts such as administrative solvency, payment of secured claims from the auction sale proceeds, and the ultimate distribution, if any, to unsecured creditors is imprecise, but there is no dispute that the additional funds from Golden Boy's upset bid would very substantially benefit creditors, particularly unsecured creditors.

The Trustee is eager to close the sale by March 28, 2014. The Acquired Assets include peanuts, which are perishable and lose value over time. In addition, the farmers in the Portales, New Mexico area, many of whom are creditors of the estate, are awaiting the outcome of the sale to decide whether or not to plant peanuts in early April.

## II. DISCUSSION

The Trustee has presented the Court with the results of a judicial auction along with a higher upset bid that was made one day later. He is torn between his desire to honor the auction results and his duty to maximize the value of the estate for the benefit of the creditor body. The Trustee has asked the Court for guidance whether he is bound to proceed with the sale to Hampton.

### I. 11 U.S.C. § 363

Section 363(f) permits a trustee, after notice and a hearing, to sell estate property free and clear of interests in the property. Bankruptcy trustees are entitled to use their discretion and business judgment in determining how to conduct sales under § 363. *In re Buerge,* 479 B.R. 101, 106 (Bankr. D. Kan. 2012) ("The trustee is granted wide discretion in the conduct of the sale"); *In re Psychrometric Sys. Inc.,* 367 B.R. 670, 674 (Bankr. D. Colo. 2007) (same); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (the trustee, in exercising her fiduciary duties, must articulate a business justification for a sale).

### II. Court Discretion in Light of a Post-Sale Overbid.

Bankruptcy courts are afforded wide latitude in deciding whether to approve § 363 sales. *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998); *Buerge,* 479 B.R. at 106. Although the Court cannot choose between competing bids, it does "have the power to disapprove a proposed sale recommended by a trustee … if it has an awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable." *In re Broadmoor Place Inv., L.P.*, 994 F.2d 744, 746 (10th Cir. 1993). This is true even if the trustee has entered into an agreement with a buyer for the sale of an asset at a particular price. As the Tenth Circuit explained, calling such an agreement a "contract" would be "a misnomer since there can be no

contract in this situation without Bankruptcy Court approval." *Id*. at 745 n. 1. In reality, such agreements "are … binding bids." *Id*. *See also Catalina Development, Inc. v. Bernard R. Given II (In re Crowder)*, 397 B.R. 544, at *7 (10th Cir. BAP 2008) (unpublished) ("[A]bsent court approval, an agreement to sell estate property outside the ordinary course of business is not a binding contract.").

The Tenth Circuit has not directly addressed the issue of whether, and under what circumstances, a bankruptcy court can disapprove a regularly conducted § 363 auction sale and reopen bidding because of a late upset bid. In considering this issue, other circuits typically weigh two competing considerations: the best interests of creditors and the integrity and finality of judicial auctions. *See, e.g., Corporate Assets, Inc. v. Paloian*, 368 F.3d 761, 767 (7th Cir. 2004); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 562 (8th Cir.1997); *In re Financial News Network Inc.*, 980 F.2d 165, 166 (2nd Cir. 1992); *First Nat'l Bank v. M/V Lightning Power*, 776 F.2d 1258, 1259 (5th Cir.1985); *cf Charter Co. v. Charter Int'l Oil Co. (In re Charter Co.)*, 829 F.2d 1054, 1055 n. 1 (11th Cir. 1987). "[T]he governing principle at a confirmation proceeding is the securing of the highest price for the bankruptcy estate. A central purpose of bankruptcy, after all, is to maximize creditor recovery." *Paloian*, 368 F.3d at 767 (citation omitted). *See also In re C.W. Mining Co.*, 636 F.3d 1257, 1265 (10th Cir. 2011) (noting that the major purpose behind bankruptcy law is "maximizing the value of the estate for its creditors"); *In re Mundy Ranch, Inc*., 484 B.R. 416, 422 (Bankr. D.N.M. 2012) (The purpose behind a § 363(f) sale is "to maximize the value of the asset, and thus enhance the payment made to creditors.") (internal quotations omitted).

On the other hand, "[r]efusing to confirm a sale to a high bidder merely because an intervening higher bid has been received is the surest way to destroy confidence in judicial sales

…." *J.J. Sugarman Co. v. Davis*, 203 F.2d 931, 932 (10th Cir. 1953). *See also In re Gil-Bern Industries*, 526 F.2d 627, 628 (1st Cir.1975) (noting that "it is important that the bidder receive what he had reason to expect, and that nothing impair public confidence in the regularity of judicial sales"). This concern can be ameliorated if the court acts consistently with the rules governing the sale "and in compliance with the bidders' reasonable expectations." *Food Barn*, 107 F.3d at 565.

Walking the tightrope between upholding orderly judicial sales process and ensuring the greatest return to creditors, courts facing similar situations have considered: (1) the applicable bidding procedures and the reasonable expectations of bidders based on those procedures;[2] (2) the amount of the overbid and the impact on creditors;[3] (3) whether the new bidder acted in good faith;[4] and (3) whether a sale order has been entered.[5]

    A.    <u>Bidding Procedures and the Parties' Reasonable Expectations</u>. The Sale Order and Bidding Procedures clearly contemplate a sale to the successful bidder at the March 20, 2014

---

[2] *See Paloian*, 368 F.3d at 766 (examining the bidding procedures, among other things, to determine whether to reopen bidding to consider a higher upset bid); *In re Bigler, LP,* 443 B.R. 101, 112-113 (Bankr. S.D. Tex. 2010) (refusing the open bidding after determining the bidding procedures clearly foreclosed the possibility of the party submitting a higher, last-minute bid).

[3] *See Food Barn*, 107 F.3d at 567 n.16 (suggesting that courts who refuse to consider a substantially higher bid risk being "dereliction in its duty to guarantee that the particular assignment was in the best interest of the estate and the unsecured creditors"); *Gil-Bern Industries, Inc.,* 526 F.2d at 629 (bankruptcy court abused its discretion by refusing "to confirm an adequate bid received in a properly and fairly conducted sale merely because a *slightly higher offer* has been received after the bidding is closed") (emphasis added); *In re Muscongus Bay Co.,* 597 F.2d 11, 12-13 (1st Cir. 1979) (affirming bankruptcy court's decision to consider a higher upset bid where the "estate gained a 21.5% Price increase by the extension of the bidding period").

[4] *See Bigler,* 443 B.R. at 109-110 (declining the reopen bidding where the movant participated in the first auction but waited until the successful bidder had already expended substantial time and efforts towards purchasing the assets to submit a higher upset bid).

[5] *Paloian*, 368 F.3d at 768 (noting that "[o]nce a court has confirmed the sale of the debtor's assets to the auction's victor, … only a narrow range of circumstances will support a court's decision to vacate the sale order and reopen the bidding"); *Food Barn*, 107 F.3d at 565 ("At some point, such as when the court actually enters an order approving the sale, expectations become sufficiently crystallized so as to render it improper to frustrate anticipated results except in the limited circumstances where there is a grossly inadequate price or fraud in the conduct of the proceedings.").

auction. Nevertheless, the language in those documents placed Hampton on reasonable notice that the auction results could be rejected by the Court. The Sale Order reserves for further determination by the Court "[a]pproval of the sale of the Acquired Assets to [Ready Roast] … or a party other than Ready Roast for a higher and better offer." Sale Order, ¶ 9. The Bidding Procedures require the Court to scrutinize the auction results to determine whether "consummation of the sale contemplated by the successful bid will provide the highest or otherwise best value for the Acquired Assets and is in the best interests of the estate." Bidding Procedures, ¶ K. They also specify that acceptance of the highest bid by the Trustee "is conditioned upon approval by the Bankruptcy Court of the successful bid and entry of a sale order approving such successful bid." *Id.* The Trustee further reserved the right to reject a Qualified Bid or adjourn hearing on final approval of the sale if he determines that accepting a particular bid is contrary to the best interests of the estate. *Id.* at ¶ P.

B.  <u>The Amount of the Overbid and Impact on Creditors</u>. The amount of Golden Boy's overbid is too high for the Court to ignore. Golden Boy has agreed to pay $4,950,000 more than Hampton. That bid is approximately 25% higher than Hampton's current bid of $20,050,000.[6] Golden Boy has not conditioned its bid on any terms or conditions that might make Hampton's bid more appealing, notwithstanding the lower price. As Golden Boy transferred the entire $25 Million to a title company, in the form of a nonrefundable deposit, and sent representatives from Canada to the continued hearing on short notice, it is unlikely they would pull out of the sale.

In cases involving such a significant percentage increase, courts have been inclined to reopen an auction to consider the higher bid. *See, e.g., Muscongus Bay Co.,* 597 F.2d at 12-13

---

[6] The percentage increase is either 24.7% or 25.3%, depending upon whether the "break-up" fee is taken into account.

-9-

Case 13-13301-t7    Doc 401    Filed 03/25/14    Entered 03/25/14 11:22:51 Page 9 of 12

(affirming bankruptcy court's decision to consider a new bid, which was 21.5% greater than the initial successful bid); *Food Barn,* 107 F.3d at 564 (affirming decision to reopen bidding where later bid was 31% greater); *In re GGSI Liquidation, Inc.,* 280 B.R. 425 (N.D. Ill. 2002), aff'd, 368 F.3d 761 (7th Cir. 2004) (decision to consider later bid that was 16% higher than the winning bid at the auction was not an abuse of discretion).

The Trustee testified that, if the Acquired Assets sell for $20,050,000, there is some risk that certain types of unsecured creditors will receive a negligible distribution.[7] Based on the Trustee's testimony regarding the Debtor's assets and liabilities, the Court is inclined to agree. A sale to Hampton at its current bid price may only cover the secured, administrative, and priority claims against the estate, whereas a sale to Golden Boy for $25 million would ensure that unsecured creditors receive most of the additional $4,950,000. Although the Court is sympathetic to Hampton's situation, it must also consider the unsecured creditors in this case, many of whom suffered significant setbacks in their businesses or farms as a result of Sunland's bankruptcy.

C. <u>The Good Faith of the Overbidder</u>. Hampton argues that Golden Boy submitted the last-minute upset bid in an attempt to gain an unfair advantage in the sale process. This argument is unconvincing. If anything, re-entering the sale process at the last minute (literally) probably put Golden Boy at a disadvantage. The bidding opened in this case at $17,475,000 and ultimately reached $20,050,000. Had Golden Boy participated in the auction process from the beginning, it may have been able to purchase the Acquired Assets for less than $25 Million. Instead, Golden Boy was required to overbid by nearly $5 million, immediately wire $25 million

---

[7] Unsecured creditors holding claims relating to the recall of the Debtor's peanut products may be receive additional insurance proceeds. The individuals who will feel the greatest impact of the additional $5 million are the local farmers and business owners who hold unsecured, non-priority claims that are not directly related to the recall.

-10-

to a trust account in the form of a nonrefundable deposit,[8] and fly its representatives to Albuquerque to testify in order for the Trustee to consider its proposal. Further, by entering the process late, Golden Boy was deprived of the opportunity to draft the Bidding Procedures and purchase agreements. The Court is therefore convinced that Golden Boy acted in good faith and was not "lying in the weeds" to obtain a tactical advantage.

        D.      <u>No Sale Order Entered</u>. Finally, no order approving the sale to Hampton Farms was entered. Had one been entered, it would have been far more difficult to consider a later bid. *Paloian*, 368 F.3d at 768; *Food Barn*, 107 F.3d at 565. Where - as here - the upset bid was made at the final sale hearing, before entry of an order approving the sale, the Court may use its discretion under § 363 to disapprove the sale. *See Broadmoor Place*, 994 F.2d at 746 (the Court has discretion to disapprove a sale if it becomes aware of a better, more acceptable proposal).

### III. CONCLUSION

Hampton argues that reopening the auction would be inherently unfair and undermine the integrity of the judicial process. Although the Court is loath to disturb the results of a judicial auction, this reluctance is counterbalanced by the amount of Golden Boy's overbid and the fact that the bidding procedures put Hampton on notice that the auction was subject to Court approval. Given Golden Boy's $25 million upset bid, the Court cannot make a finding that the sale to Hampton is in the best interests of the estate. The Court will therefore deny the Trustee's motion to approve the sale to Hampton for $20,050,000, and will reopen bidding, starting with Golden Boy's $25 Million bid. The Court will enter a separate order consistent with this memorandum opinion.

---

[8] Hampton was only required to make a $1 Million nonrefundable deposit.

-11-

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered March 25, 2014.

Copies to:

Chris Pierce
2632 Mesilla St. NE
Albuquerque, NM 87110

George D. Giddens, Jr
10400 Academy Rd NE, # 350
Albuquerque, NM 87111

Clarke C. Coll
P.O. Box 2288
Roswell, NM 88202

Alice N. Page
P.O. Box 608
Albuquerque, NM 87103

Thomas D. Walker
500 Marquette Ave. NW, #650
Albuquerque, NM 87102

Patricia A. Bradley
6500 Jefferson St. NE, #260
Albuquerque, NM 87109

Paul M. Fish
P.O. Box 2168
Albuquerque, NM 87103-2168

John J. Hall
600 Washington Ave. Suite 2500
St. Louis, MO 63101

Gail Gottlieb
P.O. Box 1945
Albuquerque, NM 87103

Ed Mazel
201 3d Street NW, #505
Albuquerque, NM 87102

Victor Carlin
P.O. Box 27047
Albuquerque, NM 87125

Roderick W. O'Donoghue
2601 Oberlin Rd., Ste. 100
Raleigh, NC 27608