UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

SUNLAND, INC.,  Case No. 7-13-13301 TR

    Debtor.

**MEMORANDUM OPINION**

    Swain Creations, Inc. ("Swain"), one of about 35 claimants that used Debtor's peanut butter its products, suffered substantial financial losses when the peanut butter was recalled in 2012. Swain moved for relief from the automatic stay to continue a pre-petition lawsuit against Debtor. The Chapter 7 Trustee ("Trustee") objected to the motion, arguing it would be better for all similarly situated creditors if the Trustee were to pool the available insurance funds and distribute them pro rata. The Court held a final hearing on Swain's stay relief motion on March 19, 2014. For the reasons stated below, the Court concludes that the motion should be denied.

I.    FACTS

    The Court finds the following facts:[1]

    Debtor filed this case under Chapter 7 on October 9, 2013 (the "Petition Date"). Clarke C. Coll was appointed and is the duly qualified and acting trustee in this case.

    Before filing the case, Debtor operated a plant in Portales, New Mexico, where it processed and sold peanuts, peanut butter, and other products.

---

[1] In making these findings, the Court took judicial notice of the docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may, sua sponte, take judicial notice of its docket); *In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 8 (1st Cir.1999) (citing Fed.R.Evid. 201 and concluding that "[t]he bankruptcy court appropriately took judicial notice of its own docket"); *In re Quade,* 496 B.R. 520, 524 (Bankr. N.D. Ill. 2013) (a "bankruptcy court [is authorized] ... to take judicial notice of its own docket").

Swain owns and operates Jer's Chocolates, a gourmet chocolatier specializing in chocolate-peanut butter confections. Until late 2012, approximately 95% of Swain's products included Debtor's peanut butter.

In September 2012, a potential outbreak of salmonella triggered a massive recall of peanut butter manufactured by Debtor. Shortly thereafter, Swain removed from the market all products containing Debtor's peanut butter.

Swain is one of approximately 35 businesses alleging losses as a result of the recall. In addition, four individuals have filed personal injury claims, asserting that they suffered from salmonella-related illness after eating products manufactured by Debtor. Together, the personal injury and commercial recall claims will be denoted the "Recall Claims" and the claimants will be denoted the "Recall Claimants."

On March 28, 2013, Swain filed a complaint against Debtor and Jimmie Shearer, Debtor's Chief Executive Officer ("Mr. Shearer") in the United States District Court for the Southern District of California (the "California District Court"), styled *Swain Creations, Inc. dba Jer's Chocolates v. Sunland, Inc. and Jimmie Shearer,* case no. 13-CV-00755-DMS-MDD (the "Lawsuit"). Swain asserted claims for breach of contract and various torts relating to the peanut butter recall. Swain seeks approximately $6.9 million in actual damages, plus punitive damages. Swain demanded a jury trial.

The Lawsuit is in the early stages of litigation. On July 16, 2013, the California District Court directed Debtor and Mr. Shearer to produce, as mandatory initial disclosures, certain insurance agreements. The California District Court entered a scheduling order on August 22, 2013, which set a final pretrial conference on June 27, 2014 and a trial on July 28, 2014.

On October 17, 2013, the Lawsuit was stayed as to the Debtor by the bankruptcy filing. It is unclear what, if any, trial preparation occurred between August 22, 2013 and October 17, 2013. No depositions were taken, nor were any dispositive motions filed.

Swain wishes to litigate the Lawsuit to judgment as soon as possible. Its business is in distress. Swain lost five to six months of revenue because of the peanut butter recall, along with most of its working capital.

Swain typically generates 51% of its revenue from sales in the fourth quarter. Mr. Swain does not believe the company has enough capital to manufacture products for the fourth quarter of 2014.

Mr. Swain has contacted various lenders in an effort to obtain financing. According to Mr. Swain, the lenders he spoke to will not agree to provide financing until the stay is lifted to allow Swain to pursue its Lawsuit.

Swain does not intend to collect any judgment from the Debtor. Instead, it seeks to recover from the Debtor's insurers.

Swain filed a proof of claim in the bankruptcy case for approximately $6.9 million.

The Debtor has insurance policies through Great American Insurance Group ("GAI"), Philadelphia Insurance Co. ("Philadelphia"), and Travelers Insurance Co. ("Travelers"), which potentially cover claims such as Swain's arising from the peanut butter recall.

The policies provided by Philadelphia and Travelers each provide $1 million in coverage.[2] Annual coverage under the GAI policy is limited to $1 million per occurrence and $2 million total, with umbrella coverage of $10 million. The GAI policy is not a "pac man" or wasting policy, meaning that defense costs do not reduce the aggregate coverage limit.

Because the recall occurred over the course of two calendar years, there is an argument that the total coverage under the GAI policy is roughly $22-24 million.[3]

In September 2013, GAI filed an action in the United States District Court for the Southern District of Ohio (the "Ohio District Court") alleging, inter alia, that the claims relating to the recall are not fully covered by the GAI polices. Though GAI withdrew its complaint shortly after learning about the bankruptcy filing, it continues to dispute coverage. If the stay is lifted to allow Swain to pursue the Recall Action, GAI would likely renew its coverage dispute in the Ohio District Court.

The Recall Claims exceed the available insurance funds. The asserted Recall Claims total about $35 million (about $5.8 million in personal injury claims and about $29.3 million in commercial claims). The potential insurance coverage, on the other hand, is between $13-$26 million. The shortfall therefore could be between $9-$22 million. Even though the final, allowed claim amounts probably will be well below the face amount, the risk of insufficient insurance is high.

Aside from the potential insurance proceeds, estate funds available to pay general unsecured claims such as the Recall Claims are limited. The Trustee estimates that

---

[2] It is unclear whether the coverage provided by Philadelphia is available to claimants of Debtor or just to claimants of the directors and officers of Debtor. For the purposes of this decision, the Court will assume that the Philadelphia policy is available to both.

[3] There is no evidence that the same argument applies to the Philadelphia and Travelers policies. Those policies were not proffered at the final hearing.

-4-

unsecured non-priority claims (including the Recall Claims) exceed $45 million. The Trustee also estimates that after payment of secured, priority, and administrative claims, he may have anywhere between $5-9 million available to pay such claims. Thus, although it is possible that, if everything goes exactly right, the dividend to Recall Claimants will be high, it seems very unlikely that it could ever be 100%.

The Trustee's position is that, rather than grant Swain stay relief, the Court should keep the automatic stay in place and allow the Trustee to negotiate "buy back" agreements with the insurance companies. Under the contemplated buy back arrangement, the insurers would pay cash to the estate in exchange for terminating their liability under the policies. The Trustee then would use the cash to pay allowed Recall Claimants whose claims are covered by insurance.

The Trustee has retained special insurance counsel to analyze coverage issues. Special counsel has met with GAI in an attempt to negotiate a buy back agreement. The Trustee anticipates that he will know whether the buy back option is viable within 60-120 days. He plans to begin reviewing and administering Recall Claims in April 2014.

## II. DISCUSSION

### A. 11 U.S.C. § 362(d).

The Court will grant a party relief from the automatic stay based on a showing of "cause." 11 U.S.C. § 362(d). "Cause" for relief from the automatic stay under 11 U.S.C. § 362 "is a discretionary determination made on a case-by-case basis." *Carbaugh v. Carbaugh (In re Carbaugh),* 278 B.R. 512, 525 (10th Cir. BAP 2002) (citing *Pursifull v. Eakin,* 814 F.2d 1501, 1506 (10th Cir. 1987)). *See also Franklin Sav. Ass'n v. Office of*

Case 13-13301-t7    Doc 431    Filed 04/04/14    Entered 04/04/14 14:49:02 Page 5 of 12

*Thrift Supervision,* 31 F.3d 1020, 1023 (10th Cir. 1994) (appellate court reviews trial court's decision on stay relief under an abuse of discretion standard).

      B.      The *Curtis* Factors.

In determining whether to modify the stay to permit a party to continue a pre-petition action against the debtor in a non-bankruptcy forum, relevant factors include:

> (1) whether the relief would result in a partial or complete resolution of the issues;
> (2) the lack of any connection or interference with the bankruptcy case;
> (3) whether the foreign proceeding involves the debtor as a fiduciary.
> (4) whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases;
> (5) whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation;
> (6) whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question;
> (7) whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties;
> (8) whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c);
> (9) whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f);
> (10) the interest of judicial economy and the expeditious and economical determination of litigation for the parties;
> (11) whether the foreign proceedings have progressed to the point where the parties are prepared for trial; and
> (12) the impact of the stay on the parties and the 'balance of the hurt.'

*In re Curtis,* 40 B.R. 795, 799-800 (Bankr. D. Utah 1984.) "The Curtis factors have been widely adopted by bankruptcy courts." *In re Busch,* 294 B.R. 137, 141 (10th Cir. BAP 2003).

-6-
Case 13-13301-t7    Doc 431    Filed 04/04/14    Entered 04/04/14 14:49:02 Page 6 of 12

C. Application of the relevant *Curtis* factors

At the final hearing, the parties focused on the factors addressing insurance coverage, trial readiness, and the impact of stay relief on Swain, Debtor, and other Recall Claimants. The Court agrees that these issues (factors 5, 7, 11, and 12) are particularly relevant in this case.

1. Insurance coverage (Factor 5). Swain argues that because Debtor is covered by insurance for any judgment entered in the Lawsuit, lifting the stay would not affect Debtor or the estate. This argument assumes that Debtor's insurers have accepted responsibility for defending the litigation. In fact, Debtor's primary insurer - GAI - disputes coverage. If the Court granted stay relief to Swain, the Trustee could be placed in the difficult position of having to litigate the coverage dispute and the Lawsuit while simultaneously administering the estate. The Court cannot make a finding that no burden to the estate would result from the Lawsuit if the stay were lifted.

2. Effect on Other Creditors (Factor 7). Allowing Swain to proceed with the Lawsuit could deplete the pool of available insurance funds at the expense of other Recall Claimants. Of the $13-26 million of insurance proceeds, Swain seeks to collect at least $6.9 million. Thus, even apart from any punitive damages, Swain could garner more than half of the insurance proceeds available to all 39 Recall Claimants. Those claimants include business owners who, like Swain, lost a lot of money because of the peanut butter recall. They also include individuals sickened by salmonella poisoning from Debtor's products. While the Court is certainly sympathetic to Swain's financial distress caused by Debtor's recall, it must also consider the effect of stay relief on other Recall Claimants.

-7-

A number of courts have declined to grant stay relief to one claimant where, as here, the available insurance coverage was inadequate to compensate other similarly situated claimants. *See, e.g., Matter of Gatke Corp.,* 117 B.R. 406, 410 (Bankr. N.D. Ind. 1990) (stay motion denied because insurance was not adequate to pay all claims); *In re Davis,* 730 F.2d 176, 185 (5th Cir. 1984) (affirming the bankruptcy court's decision to keep stay in place because "intact insurance coverage [i]s a bulwark against erosion of the estate"). *See also In re Titan Energy, Inc.,* 837 F.2d 325, 330 (8th Cir. 1988) (in many cases, "[a]llowing one claimant to collect the policy proceeds in a state court judgment would deplete the insurance pool to the detriment of all remaining creditors"). As one court noted, if an insurance policy "is too small to satisfy several potential plaintiffs[,]" then lifting the stay

> could start a race to the courthouse . . . . Such a race could mean unfair results as between potential plaintiffs; it could also prevent a bankruptcy court from marshalling the insurance proceeds, and, along with other assets, arranging for their distribution so as to maximize their ability both to satisfy legitimate creditor claims and to preserve the debtor's estate.

*Tringali v. Hathaway Machinery Co.*, 796 F.2d 553, 560 (1st Cir.1986).[4]

The Court finds that, under the circumstances, Swain could only proceed with its Lawsuit at the expense of the other Recall Claimants. This would be contrary to the purpose of the automatic stay, which is to provide for equality of distribution among creditors and "to protect creditors by averting a scramble for the debtor's assets." *Garden v. Central Nebraska Housing Corp.,* 719 F.3d 899, 910 (8th Cir. 2013) (internal quotations omitted); *Reliant Energy Servs., Inc. v. Enron Can. Corp.*, 349 F.3d 816, 825

---

[4] These cases are cited for their persuasive value on the issue of equitable distribution of insurance proceeds and not for the proposition that such proceeds are property of the estate. The Court is making no determination as to whether the proceeds fall within the scope of 11 U.S.C. § 541.

-8-

(5th Cir. 2003) (noting that the stay is meant to prevent a "race to the courthouse"). Factor 7 weighs against Swain.

3. <u>Trial readiness (Factor 11).</u> The Lawsuit is not close to being ready for trial. The scheduling order entered by the California District Court provided for about ten months of discovery and other pre-trial preparation. Less than two months later, the Lawsuit was stayed. No depositions have taken place, nor have any dispositive motions been filed. Even if the Court lifted the stay today, the case would not be ready for trial in July. More likely, the parties would have to obtain a new scheduling order that would set trial in about ten months from the reconvened scheduling conference.

On the other hand, it seems likely Swain will be paid through the claims administration process in a timely manner. The Trustee recently sold the estate's tangible real and personal property, a task that the Trustee rightly viewed as the first order of business. Now that the tangible assets have been disposed of, the Trustee intends to focus on liquidating the insurance assets and administering the Recall Claims. It is therefore possible that the Recall Claimants could receive a distribution before the end of the year.

4. <u>Balance of the Hurt (Factor 12)</u>. Swain contends that lifting the stay would enable it to obtain the necessary financing to manufacture products for the fourth quarter of this year. According to Mr. Swain, banks want to know that a judgment is forthcoming.

If lifting the stay would allow Swain to obtain immediate funding, the Court would be presented with the unhappy alternatives of jeopardizing Swain's viability or

allowing Swain to take a disproportionate share of available insurance. It seems unlikely, however, that the options are as dire as Swain argues.

The Court is skeptical that lenders would condition financing on a borrower obtaining relief from the stay to pursue an unliquidated claim, especially where the insurance coverage is disputed and the trial date is unknown. Swain offered no evidence that any lender promised to loan money upon receipt of a stay relief order. Given the uncertain connection between stay relief and Swain's ability to actually collect from Debtor or its insurer following a judgment, the Court doubts immediate financing would be made available to Swain if the stay were modified now. Thus, the Court is not convinced that Swain would suffer immediate, adverse consequences if the stay is not modified.

On the other hand, lifting the stay could interfere with the administration of the bankruptcy estate. For example, allowing Swain to proceed with the Lawsuit probably would prompt GAI to re-file its declaratory judgment action. The dispute could interfere with the Trustee's ability to pursue policy buy backs and establish a trust for the benefit of the Recall Claimants.

In addition, if the Court granted stay relief to Swain, other Recall Claimants would likely follow suit. There are eight lawsuits pending against the estate, in various jurisdictions throughout the country. If the Court granted stay relief to each Recall Claimant who asked, the Trustee would be required to spend much of his time and the estate's money defending those lawsuits rather than pursuing insurance buy backs, administering Recall Claims, and disbursing money to the creditors.

When discussing factor 12 the *Curtis* court stated: "The most important factor … is the effect of such litigation on the administration of the estate. Even slight interference with the administration may be enough to preclude relief in the absence of a commensurate benefit." *In re Curtis,* 40 B.R. 795, 806 (Bankr. D. Utah 1984.) The Court finds that Swain's pursuit of the Lawsuit would interfere with administration of the estate.

5.  The remaining *Curtis* Factors.  Most of the remaining relevant *Curtis* factors weigh against granting stay relief. Modifying the stay would interfere with the bankruptcy case (factor 2), for the reasons set forth above. The California District Court does not have specialized experience in commercial damage claims (factor 4). If anything, such claims are often adjudicated by bankruptcy courts. Because Swain is seeking punitive damages, a judgment issued by the California District Court could be subject in part to equitable subordination under 11 U.S.C. § 510(c) (factor 8). Finally, allowing Swain's claim to proceed in a different forum while this Court adjudicates similar or identical claims would be duplicative and wasteful (factor 10). This is particularly true if the Court lifts the stay for other Recall Claimants, forcing courts across the country to try similar issues.

Factors 3, 6, and 9 do not apply here. Factor 1 (whether relief would result in partial or complete resolution of the issues) favors Swain.

### III.   CONCLUSION

The Court finds Swain has not demonstrated sufficient "cause" to obtain relief from the stay. Allowing the Lawsuit to proceed would have a substantial adverse effect on the estate and other Recall Claimants. The Court will therefore deny Swain's motion.

The Court will, however, set a status conference in the near future on the Trustee's insurance policy buy back efforts. If it appears that the Trustee will not be able, timely, to pool the available insurance funds for the benefit of Swain and the other Recall Claimants, the Court will revisit Swain's stay relief request.

A separate order will be entered consistent with this Memorandum Opinion.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered April 4, 2014.

Copies to:

Clarke C. Coll
P.O. Box 2288
Roswell, NM 88202

Thomas D. Walker & Leslie Maxwell
500 Marquette Ave. NW, Suite 650
Albuquerque, NM 87102

R. Thomas Dawe
317 Commercial NE, Second Floor
Albuquerque, NM 87102

Joseph M. Yar
201 Third Street NW
Albuquerque, NM 87102

United States Trustee
P.O. Box 608
Albuquerque, NM 87103

Aletheia V. Allen
201 Third Street, NW, #505
Albuquerque, NM 87102